UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RENA LANE VANLENGEN,

Plaintiff,

v.

ANDREW M. SAUL,
COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

Case No. 18-cv-00566-JCS

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT, DENYING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND
REMANDING FOR AWARD OF
BENEFITS**

Re: Dkt. Nos. 21, 24

## I.    INTRODUCTION

Plaintiff Rena VanLengen seeks review of the final decision of Defendant Andrew M.
Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying her
applications for Supplemental Security Income ("SSI") benefits under Title XVI of the Social
Security Act.  For the reasons stated below, the Court GRANTS VanLengen's Motion for
Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, REVERSES
the decision of the Commissioner and REMANDS the case to the Social Security Administration
for award of benefits.[1]

## II.    BACKGROUND

### A.    Factual Background

#### 1.  Educational and Employment Background

VanLengen was born on October 27, 1966.  Administrative Record ("AR") 219.  She
completed 10th grade.  AR 240.  She testified that she left school because she was "into drugs."

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28
U.S.C. § 636(c).

AR 66. Between January 1999 and December 2002, VanLengen worked as a home care giver, a bartender and a restaurant manager. AR 241, 270. She stopped working in December 2002 and claimed on her initial application for SSI that she became disabled at that time; at the hearing before the ALJ she amended her onset date to the date of her SSI application, December 26, 2013. AR 56.

### 2. Medical History

#### a. Overview of Alleged Impairments

At the hearing before an Administrative Law Judge ("ALJ"), conducted on April 1, 2016, VanLengen's attorney explained that the primary impairment that is the basis of of VanLengen's SSI claim, her chronic abdominal pain, began in March 2013. AR 61. At that time, VanLengen was hospitalized for "[m]ultiple intra-abdominal abscesses," "[a]cute sepsis syndrome [and] systemic inflammatory response syndrome secondary to" the abscesses, and "[r]uptured ovarian cyst leading to left salpingo-oophorectomy with extensive lysis of adhesions." AR 336. A year later she was diagnosed with "pelvic adhesions and adhesive disease," among other things, and on May 13, 2014 VanLengen underwent a "total laparoscopic hysterectomy and right salpingo-oophorectomy with extensive lysis of adhesions." AR 519. Since her hospitalization and surgery in 2013, VanLengen has suffered from chronic abdominal/pelvic pain due to adhesion (scarring). AR 111, 239, 551. In addition to her chronic abdominal pain, VanLengen claims she is impaired by chronic headaches (*see, e.g.*, AR 313, 807-809, 821, 844, 947, 1165); anxiety, depression and memory and cognitive problems (*see, e.g.,* AR 123, 149, 1189); and tarsal tunnel syndrome in her feet (*see, e.g.,* AR 284, 825-826, 833).

#### b. Treating Physicians

The administrative record reflects that since her onset date, the vast majority of VanLengen's medical care has been provided by the Sonoma County Indian Health Project, where she was treated by, among others, Ellen Kruusmagi, M.D. (her primary care physician), Neil Steinberg, Psy. D. (her psychologist) and John Hollander, D.P.M. (her podiatrist). The record reflects that Sonoma County Indian Health Project has its own pharmacy that filled many of the prescriptions written by the doctors who treated VanLengen there. *See, e.g.,* AR 562, 572, 735,

840. During the relevant period, VanLengen also was evaluated by and received treatment at Sutter Medical Center of Santa Rosa and was referred out to other providers for treatment as well, including Marcia Luisi, M.D., who conducted electrodiagnostic testing of VanLengen's lower extremities to evaluate for possible tarsal tunnel syndrome at the request of Dr. Hollander.

### i.   Dr. Kruusmagi

*Treatment Notes*

VanLengen's primary care physician was Dr. Ellen Kruusmagi, who has treated VanLengen since February 2013. *See* AR 641.   Treatment notes from Plaintiff's visits reflect that Dr. Kruusmagi provided ongoing treatment for Plaintiff's abdominal pain, as well as for anxiety and depression and difficulty sleeping.  April 22, 2013 treatment notes reflect that VanLengen was recovering from "extensive hospital stay for septicemia and multiple abdominal abcesses," that she "still ha[d] diffuse abdominal pain," was on IV antibiotics and was "very weak." AR-456-457. Dr. Kruusmagi prescribed oxycodone/acetaminophen to be taken "as needed for pain." *Id.*  June 10, 2013 notes reflect that VanLengen was experiencing "sharp lasting" pelvic pain; Dr. Kruusmagi observed that VanLengen's abdominal pain was "most likely secondary to all of the scarring she developed with her severe abdominal infection." AR 448-449.  Dr. Kruusmagi prescribed 800 mg. ibuprofen tablets. *Id.*  November 6, 2013 treatment notes reflecting "intermittent abdominal pain," and occasional migraine headaches. AR 436-440.  Dr. Kruusmagi again prescribed 800 mg. ibuprofen tablets and a "small amount of narcotic," namely, hydrocodone/acetaminophen, with a caution that "[n]arcotics should not be used on a regular basis for this type of problem and that she expected the prescription to "last." *Id.*

December 4, 2013 notes reflect that VanLengen was experiencing "intermittent abdominal pain that sometimes extends to the sides of her chest" and depression. AR 428. Dr. Kruusmagi ordered a pelvic ultrasound and prescribed Zoloft and Trazodone. *Id.*  January 8, 2014 notes reflect that Plaintiff was reporting continued abdominal pain and pain in her chest when she took deep breaths. AR 422-423.  Dr. Kruusmagi increased VanLengen's Zoloft dose. *Id.*   March 5, 2014 notes reflect that Plaintiff had experienced pelvic pain for "months" and that the prescription-strength ibuprofen helped "a bit." AR 405-407.  April 9, 2014 notes reflect that Dr.

Kruusimagi told VanLengen that removal of her remaining ovary would likely help with pain associated with menses and heavy bleeding but "might not relieve the everyday pelvic pain as this may be related to adhesions from the extensive previous infection." AR 584-586.

Treatment notes from a visit to Dr. Kruusmagi on June 13, 2014, after VanLengen had undergone the hysterectomy discussed above, in May 2014, reflect that VanLengen was "anxious" and "tearful," had "jumpy" legs due to Trazadone, was experiencing abdominal pain at night and that VanLengen's abdomen was "tender to deep palpitation." AR 571-572. September 3, 2014 notes reflect that VanLengen's chief complaint was abdominal pain, that she was still experiencing insomnia and that she had gained weight. AR 558-564. Dr. Kruusmagi prescribed 800 mg. ibuprofen tablets for pain and Zolpidem for sleep. *Id*. On December 31, 2014, Dr. Kruusmagi noted that Plaintiff had experienced "ongoing intermittent abdominal pain worse with bowel movements." AR 744. Dr. Kruusmagi "asked her to start working on weight loss," noting that Plaintiff had gained "about 20-30 pounds since her surgery." *Id*. She refilled VanLengen's prescription for Zolpidem. AR 746.

On January 28, 2015, Dr. Kruusmagi noted that VanLengen experienced "mild daily abdominal pain" and that "frequently throughout the day" it "will flare up and she will have to rest, sit down or lay down." AR 734. Dr. Kruusmagi noted that the abdominal pain "wakes her up every morning and worsens when she has a bowel movement." *Id.* Dr. Kruusmagi also observed that VanLengen was overweight and made a "strong recommendation" to lose weight "as this can help the abdominal pain." *Id*. Dr. Kruusmagi noted that VanLengen "look[ed] uncomfortable" but that she was able to ambulate in and out of the clinic. AR 735. Dr. Kruusmagi refilled a prescription for Sumatriptan for VanLengen's migraine headaches during this visit. AR 735.

Notes from a March 4, 2015 visit reflect that VanLengen "has had constant daily abdominal pain since the severe abdominal infection and septicemia in early 2013." AR 716. Further, VanLengen continued to report that "the pain wakes her up in the morning and that she has it all day." *Id.* The notes reflect that "[b]owel movements make it worse" and that while "[o]ccasionally she can get into a position that will be comfortable for a short period of time" "[s]he is unable to sit in one position for very long." *Id*. Dr. Kruusmagi also noted that VanLengen was experiencing "almost daily headaches" with sensitivity to bright lights, and that VanLengen took ibuprofen daily and Sumatriptan

4

occasionally.  *Id.*  Dr. Kruusmagi prescribed 800 mg. ibuprofen tablets for pain, sumatriptan for headaches and zolpidem for sleep.  AR 718.

In treatment notes from a visit on April 22, 2014, Dr. Kruusmagi opined that VanLengen "has two types of pain[:] . . . a general mid abdominal pain worse with BM and an epigastric pain that feels like she is hungry."  AR 861.  Dr. Kruusmagi assessed the second type of pain to be gastritis, while the first she described as "adhesion pain," that is, pain associated with the scarring in VanLengen's abdomen.  *Id.*  On August 5, 2015, Dr. Kruusmagi noted that VanLengen has "chronic abdominal pain," that she takes Motrin and Tylenol for the pain and that she "has been trying to lose weight as this may help."  AR 833.  Although VanLengen was "down to 194" pounds, Dr. Kruusmagi noted that Plaintiff was still overweight.  *Id.*  Dr. Kruusmagi also noted that VanLengen had "corns and calluses" on her feet and had recently seen Dr. Holland, a podiatrist.  *Id.*

September 23, 2015 treatment notes reflect that VanLengen continued to experience abdominal pain and complain of headaches.  AR 820.  Dr. Kruusmagi noted that VanLengen "does take Propranolol" for her headaches but that she was "out of Sumatriptan."  *Id.*; *see also* AR 1029 (May 6, 2013 prescription for Propranolol for "cardiovascular therapy").  Dr. Kruusmagi refilled VanLengen's prescription for Sumatriptan and Zolpidem.  AR 821.  In notes from a November 18, 2015 visit, Dr. Kruusmagi noted that the purpose of VanLengen's visit was to manage abdominal pain with bowel movements that VanLengen had experienced for "months" and migraines.  AR 927.  She noted that VanLengen was experiencing increased abdominal pain and insomnia.  *Id.*  Dr. Kruusmagi wrote that VanLengen had seen Dr. Hollander for bilateral Tarsal Tunnel Syndrome and that he had started her on Neurontin.  *Id.*  She also noted that Dr. Holland had recommended compression stockings and topical NSAIDs but that VanLengen was unable to get them because they were not covered by insurance.  *Id.*

On January 6, 2016, Dr. Kruusmagi saw VanLengen again for abdominal pain, nausea and vomiting.  AR 916.  Dr. Kruusmagi referred VanLengen to the Emergency Room due to the severity of her symptoms.  AR 917; *see also* AR 939 (reflecting that VanLengen went to the Emergency Room that day and that a CT scan showed a kidney stone that had also be observed in earlier CT scan in 2013, which was removed using uteroscopy with laser lithotripsy).

*RFC Questionnaires*

Dr. Kruusmagi completed four questionnaires in connection with VanLengen's SSI application: 1) a Residual Functional Capacity Questionnaire dated March 12, 2014, AR 1005-1007; 2) a Residual Functional Capacity Questionnaire dated January 28, 2015, AR 641-642; 3) a Headache Residual Functional Capacity Questionnaire, dated March 4, 2015, AR 807-809; and 4) a Physical Assessment, dated February 24, 2016, AR 996-998.

In the RFC questionnaire dated March 12, 2014, Dr. Kruusmagi described VanLengen's diagnosis as "chronic abdominal pain due to adhesions and previous surgery." AR 402. She opined that VanLengen's symptoms (lower abdominal pain "much worse with urination and Bowel movements") are "constantly" severe enough to interfere with the attention and concentration required to perform simple work-related tasks. *Id*. In response to questions addressing VanLengen's ability to sit, Dr. Kruusmagi opined that VanLengen can sit for thirty minutes at a time for a total of four hours in an eight-hour day and stand/walk for thirty minutes at a time for three of eight hours. *Id*. She checked "no" in response to the question "Does your patient need a job which permits shifting positions at will from sitting, standing or walking" with the following a handwritten explanation: "(in pain all day) shifting won't help." *Id*. Dr. Kruusmagi indicated that VanLengen would need to take unscheduled breaks every thirty minutes and that the required breaks would need to be 30 minutes long. *Id*. The next question addressed limitations on lifting and carrying. *Id*. at 403. Dr. Kruusmagi opined that VanLengen can occasionally lift up to ten pounds and never lift more than ten pounds. *Id*. Dr. Kruusmagi answered "no" in response to the question that followed, which asked whether VanLengen had trouble with "reaching handling or fingering." *Id*. She wrote in the margin next to this question, "no probs with hands – just can't sit." *Id*. In response to a question asking how often Plaintiff would be "likely to be absent from work" as a result of her impairments, Dr. Kruusmagi checked the option for "More than four times a month" and wrote under the option she had checked "much more." *Id*. Finally, she answered "no" in response to the question of whether VanLengen was "physically capable of working an 8 hour day, 5 days a week employment on a sustained basis." *Id*.

1       Just under a year later, on January 28, 2015, Dr. Kruusmagi completed the same Residual

2 Functional Capacity Questionnaire a second time. Her answers were the same or similar to the

3 previous RFC questionnaire. She again answered the questions about sitting limitations by stating

4 that VanLengen could sit no more than thirty minutes at one time and no more than four hours in

5 an eight-hour work day. AR 641. Likewise, she again answered "no" in the response to the

6 question asking whether VanLengen needed a job that would allow her to shift positions, with a

7 handwritten note next to the question saying that "this will not help." *Id.* She opined that

8 VanLengen would need to take unscheduled breaks "at least hourly" (previously she said every

9 thirty minutes) and the breaks would last thirty minutes (the same as in the previous RFC

10 questionnaire). *Id.* As in the previous questionnaire, Dr. Kruusmagi stated that VanLengen could

11 lift ten pounds occasionally and could never lift more than ten pounds. AR 642. She again

12 checked the "no" box in response to the question about repetitive reaching, handling or fingering,

13 with a handwritten notation stating "hands – fingers and arms work[.] It is the abdominal pain that

14 is the limiting factor." *Id.* Although the follow-on question (asking the doctor to provide the

15 percentage of the work day the claimant could perform certain activities using her hands, fingers

16 and arms) was to be answered only if the answer to the previous question was "yes," Dr.

17 Kruusmagi filled in the blanks for the specified activities, indicating that VanLengen's ability to

18 use her hands, fingers and arms to perform them could not exceed 50% of the work day. *Id.* Dr.

19 Kruusmagi again checked the box indicating VanLengen would miss more than four days a month

20 of work and checked "no" in response to the question as to whether VanLengent was capable of

21 "working an 8 hour day, 5 days a week employment on a sustained basis." *Id.*

22       On March 4, 2015, Dr. Kruusmagi completed a Headache Residual Functional Capacity

23 Questionnaire. The first half of the questionnaire posed questions specifically related to

24 VanLengen's headache symptoms and limitations that were not included on the RFC

25 questionnaires discussed above. In response to these questions, Dr. Kruusmagi stated that

26 VanLengen suffered from headaches six days a week that were "severe so that [they] interfere

27 with activity." AR 807. She stated that VanLengen's headaches were triggered by bright light

28 and that to make them better she needed to lie in a dark room, and that ibuprofen and Sumatriptan

help. *Id.*; *see also* AR 808 (stating that ibuprofen and Sumatriptan provide "moderate relief"). She stated that VanLengen's headaches caused impaired sleep. AR 807. Dr. Kruusimagi attributed VanLengen's headaches to "migraine" and "abdominal pain," and also opined that "emotional factors" contribute "somewhat" to VanLengen's headaches. AR 808. She stated that the medications used to treat VanLengen's headaches (ibuprofen 800 mg. and Sumatriptan) cause "some fatigue." *Id*. Dr. Kruusmagi states that VanLengen would not be able to work when she had headaches, that she would need to take unscheduled breaks five times a week due to headaches and would need these breaks to last at least two hours. *Id*.

The Headache RFC questionnaire went on to ask a series of questions about VanLengen's physical limitations. AR 808-809. In this section, Dr. Kruusmagi again stated that VanLengen could lift ten pounds occasionally and could never lift more than ten pounds. AR 808. The next question asked how long VanLengen could sit at one time and Dr. Kruusmagi gave the same response she had given in the two RFC questionnaires discussed above, namely, that VanLengen could not sit for more than 30 minutes at a time. AR 809. She opined that VanLengen would need to sit or lie down for a total of four hours of an eight-hour day. *Id.* She further stated that VanLengen's ability to sit or stand was less than two hours a day. *Id*. As in the previous questionnaires, Dr. Kruusmagi stated that VanLengen was likely to miss more than four days of work a month due to her impairments. *Id*

Finally, on February 24, 2016, Dr. Kruusmagi completed a Physical Assessment. AR 996-998. In that questionnaire, Dr. Kruusmagi stated that VanLengen's diagnosis was "chronic abdominal pain due to previous severe abdominal internal infections and subsequent bowel adhesion and scar[r]ing." AR 997. She listed constipation and diarrhea as side-effects VanLengen experienced due to medications. *Id*. Dr. Kruusmagi opined that VanLengen could sit no more than a total of three hours of an eight-hour work day and stand or walk no more than two hours a day. *Id*. She again stated that VanLengen would need to take breaks every 30 minutes; she estimated these breaks would last 15-20 minutes. *Id*. Dr. Kruusmagi found the same restrictions as to lifting and carrying that she had found in the forms discussed above. *Id*. In response to the question whether VanLengen had limitations as to repetitive reaching, handling or fingering, Dr.

Kruusmagi for the first time checked the "yes" box. She went on to provide percentages for various activities, opining that Plaintiff's limitations with respect to reaching, handling and fingering would limit her to performing these activities no more than 25% of the work day. Again, a handwritten notation next to this question made clear that Dr. Kruusmagi did not see these limitations as primary; she wrote, "It is more sitting in place greater than 30 min. that is the difficulty." *Id.* She again opined that VanLengen would miss more than four days of work a month due to her impairments. AR 998.

### ii. Dr. Steinberg

Dr. Steinberg, a psychologist at the Sonoma County Indian Health Project, began seeing VanLengen in August 2014 for psychotherapy and pain management. AR 707. Treatment notes indicate that he saw VanLengen for treatment approximately twice a month and sometimes weekly. AR 714-715, 723, 724, 730, 731, 740-742, 747-750. He diagnosed VanLengen with "chronic psychogenic pain." AR 714. Dr. Steinberg completed a Cognitive Functioning Evaluation on December 30, 2014 and January 7, 2015. AR 1180. He administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"). VanLengen's full scale score, verbal composite score and verbal comprehension scores were all "borderline", with working memory scored as "extremely low," processing speed at "low average," performance composite score at "beginning average" and perceptual organization at "average." *Id.* Dr. Steinberg concluded based on these scores that VanLengen's "verbal learning capacity is impoverished" and that her low scores with respect to working memory, verbal composite and verbal comprehension make it "very challenging for this patient to function in her daily life." *Id.*

Dr. Steinberg completed two RFC questionnaires: 1) a Residual Functional Capacity Questionnaire dated February 16, 2015, AR 707-708; and 2) a Headache Residual Functional Capacity Questionnaire, also dated February 16, 2015, AR 1009-1011. In the former, Dr. Steinberg listed VanLengen's diagnosis as "Pain Disorder: Psychological and Medical" and "Major Depression." AR 707. He listed VanLengen's symptoms as "pain, hopelessness, helplessness, impoverished energy, cognitive deficit" and opined that these symptoms would "frequently" be "severe enough to interfere with the attention and concentration required to

9

perform simple work-related tasks." *Id*. Dr. Steinberg deferred numerous questions to VanLengen's medical provider, leaving blank the questions about side-effects of medications, VanLengen's ability to use her hands and arms, and the number of days of work she would miss each month due to her symptoms. *Id*. at 707-708. He did answer the questions about VanLengen's ability to sit, stand and walk, opining that VanLengen could sit for 60 minutes at a time for a total of no more than four hours a day and could stand and walk no more than a total of two hours a day. AR 707. He also indicated that VanLengen would need to take ten-minute breaks every thirty minutes. *Id*.

In the headache RFC questionnaire that Dr. Steinberg completed on the same day, he again wrote that VanLengen's diagnosis was "Chronic Pain, Psychological [and] Medical." AR 1009. He noted that headache was "not [Plaintiff's] primary symptom" and elsewhere in the form crossed out "headache" and replaced it with "chronic pain." AR 1009-1010. In response to a number of the headache questions, Dr. Steinberg wrote N/A (not applicable). *Id*. He again opined that VanLengen would need to take unscheduled ten-minute breaks every thirty minutes. AR 1010. On this form, Dr. Steinberg responded to the question about how many days of work VanLengen would miss due to her impairments, checking the box for "more than four times a month." AR 1011. He also listed as an additional limitation that would affect VanLengen's ability to work VanLengen's "severe cognitive learning limitations." AR 1011.

**B.    Legal Background for Determination of Disability: Five-Step Analysis**

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to

consider subsequent steps." *Id.*

At step one, the Administrative Law Judge ("ALJ") considers whether the claimant is

presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If she is, the

ALJ must find that she is not disabled. *Id.* If she is not engaged in substantial gainful activity, the

ALJ continues the analysis. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable

physical or mental impairment," or combination of such impairments, which meets the

regulations' twelve-month duration requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An

impairment or combination of impairments is severe if it "significantly limits [the claimant's]

physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant

does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii).

If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.

*See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a

list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20

C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination

of the claimant's impairments meets or equals the severity of a listed impairment, she is disabled.

20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis continues. *See id.*

At step four, the ALJ considers the claimant's residual functional capacity ("RFC") in light

of her impairments and whether she can perform past relevant work. 20 C.F.R.

§ 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)). If she can perform past relevant work, she

is not disabled. *Id.* If she cannot perform past relevant work, the ALJ proceeds to the final step.

*See id.*

At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in

light of her impairments, age, education, and work experience, can perform other jobs in the

national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R.

§ 404.1520(a)(4)(v). If the Commissioner meets this burden, the claimant is not disabled.

*See* 20 C.F.R. § 404.1520(f). Conversely, the claimant is disabled and entitled to benefits if there

United States District Court
Northern District of California

are not a significant number of jobs available in the national economy that she can perform.  *Id.*

## C.    Procedural Background

### 1.  The Hearing

A hearing on VanLengen's application for SSI was held on April 1, 2016.  AR 48.  ALJ Suzanne Krolikowski presided over the hearing.  VanLegen was represented by an attorney, Negin Mohajeri.  A vocational expert ("VE"), Luis Mas, also offered testimony.

### 2.  The ALJ's Decision

In her decision, the ALJ found at step one that VanLengen had not engaged in substantial gainful activity since December 26, 2013, the amended alleged onset date. AR 31. She found at step two that VanLengen suffered from the following severe impairments:  "pain disorder/chronic abdominal and pelvic pain status post infection and scarring status post surgery, migraines, bilateral tarsal tunnel syndrome, major depressive disorder, and organic mental disorder."  *Id.*  At step three, the ALJ found that VanLengen's impairments do not meet or medically equal the severity of any listed impairment.  AR 32.  At step four, the ALJ found VanLengen had the residual functional capacity to perform light work, except:

> she can understand, remember, and carry out simple instructions and make simple work related decisions. She can tolerate occasional interaction with coworkers, supervisors, and no interaction with the public. She can occasionally climb ramps and stairs and cannot climb ropes, ladders and scaffolds. She can have no exposure to light brighter than that typically found in an indoor work environment such as an office or retail store.

AR 33.  The ALJ concluded that VanLengen has no past relevant work, but she could perform other work as a small parts assembler, production assembler, and photocopy worker and that these jobs exist in significant number in the national economy.  AR 39-40.  On that basis, the ALJ concluded that VanLengen was not disabled.

## D.    Contentions of the Parties on Summary Judgment

VanLengen argues that the ALJ erred in rejecting the opinions of Dr. Kruusmagi, whose opinions about VanLengen's limitations should have been given more weight because she is a treating physician.  According to VanLengen, because the ALJ did not offer adequate reasons for refusing to credit Dr. Kruusmagi's opinions, her finding that VanLengen is not disabled is not

supported by substantial evidence. The Commissioner, in turn, contends the ALJ's decision is supported by substantial evidence and that she provided adequate reasons for rejecting the opinions of Dr. Kruusmagi in weighing the evidence and determining that VanLengen is not disabled.

## III.   ANALYSIS

### A.   General Legal Standards Governing Review of Disability Determinations

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)) (quotation marks omitted). Substantial evidence must be based on the record as a whole and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "must be 'more than a mere scintilla,' but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). Even if the Commissioner's findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

The Court must review the record as a whole, considering the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Reviewing courts "are constrained to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (citing *SEC v.*

*Chenery Corp.*, 332 U.S. 194, 196 (1947)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

**B.    Legal Standards Governing Consideration of Opinions by Treating Physicians**

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "[T]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Id* at 1202 (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it very little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012–13.

## C. Whether the ALJ's Erred in Rejecting Dr. Kruusmagi's Opinions

ALJ Krolikowski gave "little weight" to the opinions that Dr. Kruusmagi expressed on the four questionnaires described above, offering the following reasons for doing so: 1) "the assessments contain many different and conflicting limitations without any specific explanation"; 2) "the treatment record . . . does not support the limitations found in these assessments": 3) Dr. Kruusmagi noted in the February 2016 assessment that she completed the form "together" with Plaintiff, leading the ALJ to conclude that Dr. Kruusmagi "seemed to uncritically accept as true most, if not all, of what the claimant reported." AR 38. The Court finds that the reasons offered by ALJ Krolikowski for rejecting the opinions of Dr. Krolikowski were legally inadequate and not supported by substantial evidence *except* with respect to limitations reflected on the two RFC forms relating to Plaintiff's ability to use her fingers, hands and arms.

### a. "conflicting limitations"

The ALJ offers one example of "conflicting limitations" in Dr. Kruusmagi's opinons: "she opines that the claimant cannot sit, but then states she can for 30 minutes, then for less than two hours, then for three hours." AR 38. The ALJ opines, "[w]hile it is possible she believes the claimant's sitting ability had improved based on her treatment, there is no reason for these limitations and differences." *Id*. This reason for rejecting Dr. Kruusmagi's opinions is not specific and legitimate and is not supported by substantial evidence.[2]

First, ALJ Krolikowski mischaracterizes Dr. Kruusmagi's opinion when she states that

---

[2] As discussed above, the standard that applies to the weighing of a treating physician's opinion depends on whether or not there is conflicting evidence in the record. Although the ALJ did not cite to it, a report by consultative examiner Dr. Robert Tang, who examined Plaintiff once and reviewed some of her medical records, concludes that Plaintiff has "[n]o limitations sitting." AR 1193. Therefore, the Court applies the specific and legitimate reasons standard to Dr. Kruusmagi's opinions about Plaintiff's sitting limitations.

15

"she opines that the claimant cannot sit."  The only evidence in the record that could possibly support this statement is the notation on the March 12, 2014 RFC questionnaire next to the questions about limitations relating to the claimant's use of hands, fingers and arms, where Dr. Kruusmagi wrote "no probs with hands – just can't sit." AR 1006.  ALJ Krolikowski ignores, however, Dr. Kruusmagi's very specific responses to the previous question on the same questionnaire, which specifically addressed VanLengen's limitations with respect to sitting.  AR 1005. These responses made clear that Kruusmagi's opinion as to VanLenren's limitations was that VanLengen could sit for no more than 30 minutes at a time and no more than four hours in an eight hour work day.  The only reasonable interpretation of the notation on the next page was that Dr. Kruusmagi's statement that VanLengen "just can't sit" was intended as a shorthand referencing the fairly significant limitations identified by Dr. Kruusmagi in response to the question on the previous page of the same questionnaire.

Second, the opinions Dr. Kruusmagi offered in the questionnaires she completed in support of VanLengen's application are consistent with respect to VanLengen's ability to sit.  In the RFC questionnaire Dr. Kruusmagi completed January 28, 2015, almost a year after the once containing the "can not sit" notation, she again opined that VanLengen could not sit more than thirty minutes at once or more than four hours in a work day.  AR 641.  And in the Physical Assessment that Dr. Kruusmagi completed almost a year after that, she opined that VanLengen would need to take unscheduled breaks "every ½ hour" and could sit a total of three hours out of an eight-hour day.  AR 997.  While the total hours that Dr. Kruusmagi thought VanLengen could sit during the course of an eight-hour work day was somewhat lower than in her previous assessments, it is consistent with the medical records, which reflect that in a visit to Dr. Kruusmagi a little over a month before Dr. Kruusmagi completed the Physical Assessment VanLengen's abdominal pain was so severe that Dr. Kruusmagi referred her to the Emergency Room.  AR  916-917.

ALJ Krolikowski also fabricates an inconsistency that does not exist when she states that Dr. Kruusmagi opined that Plaintiff could sit "for 30 minutes, then for less than two hours, then for 3 hours."  AR 38.  The thirty minutes opinion, as discussed above, relates to VanLengen's ability to sit at one time without a break and Dr. Kruusmagi's opinion is consistent on that

question in all of her assessments.  The three hours opinion relates to the *total* number of hours

Plaintiff is able to sit during an eight-hour day (assuming she is allowed to take a break or shift her

position).  This is a comparison of apples to oranges and thus offers no support for ALJ

Krolikowski's conclusion.  Her reference to two hours is even more perplexing.  That figure is

provided only on the headache assessment and relates the amount of time Plaintiff's headaches

typically last (which is also the amount of time Dr. Kruusmagi opined VanLengen needs to rest

when she gets a headache).  AR 807-808.  In other words, this opinion was unrelated to Dr.

Kruusmagi's opinions about the sitting limitations associated with VanLengen's abdominal pain.

Finally, to the extent that ALJ Krolikowski relies on purported inconsistencies in Dr.

Kruusmagi's opinions to reject opinions about limitations other than the sitting limitations that are

the subject of her example, this reasons is not adequate.  Even assuming that the specific and

legitimate reasons standard applies, ALJ Krolikowski was required to identify *specific*

inconsistencies relevant to whatever opinions she was rejecting.  Conclusory or boilerplate

statements that Dr. Kruusmagi's opinions were inconsistent do not suffice.

### b.  "the treatment record"

ALJ Krolikowski makes three specific points about the treatment record in support of her

conclusion that Dr. Kruusmagi's opinions should be afforded little weight.  First, she states that

the limitations associated with VanLengen's headaches are "wholly without support" because the

record "shows the claimant had limited treatment for headaches, with improvement on

medications, as averred by the claimant in her testimony."  AR 38.  Second, she states that there

are no treatment records that support the limitations Dr. Kruusmagi found as to VanLengen's

fingers, hands and arms.  *Id.*  Third, the ALJ states that "[t]he need for lifting up to 10 pounds,

unscheduled breaks, absences and preclusion from work activity is not supported by the treatment

record, which demonstrated improvement in foot pain, as well as abdominal pain."  *Id.*  While the

second reason provides an adequate basis for giving little weight to the limitations Dr. Kruusmagi

listed on the RFC questionnaires for use of Plaintiff's fingers hands and arms, these are not

legitimate reasons for rejecting the other limitations listed by Dr. Kruusmagi in her assessments;

nor is the ALJ's rejection of those opinions supported by substantial evidence in the record.

17

With respect to the percentages Dr. Kruusmagi provided in the January 28, 2015 RFC questionnaire and the February 24, 2016 Physical Assessment in response to questions about Plaintiff's limitations relating to use of her fingers, hands and arms, it is unclear from Dr. Kruusmagi's treatment records how she arrived at these opinions. The Court has carefully reviewed Dr. Kruusmagi's treatment notes and finds no specific references to problems with VanLengen's fingers, hands or arms; nor does it appear that Dr. Kruusmagi ever diagnosed or treated VanLengen for such problems. While it is not inconceivable that Dr. Kruusmagi's opinions about VanLengen's ability to perform such tasks as fine manipulation with her fingers were based on VanLengen's headaches or abdominal pain (which are addressed extensively in Dr. Kruusmagi's treatment notes), the ALJ's conclusion that these limitations were not supported by the record is a clear and convincing reason (assuming without deciding that that higher standard applies) for rejecting of Dr. Kruusmagi's opinions as to those specific limitations.

The absence of treatment notes or other medical records relating to VanLengen's use of her hands, fingers and arms does not, however, offer a specific and legitimate – or clear and convincing – reason to reject Dr. Kruusmagi's opinions regarding VanLengen's other limitations. The other two points made by ALJ Krolikowski regarding the medical record also don't meet these standards. First, the Court addresses the medical record related to VanLengen's headaches. According to the ALJ, VanLengen's treatment history does not support Dr. Kruusmagi's opinions as to severity of VanLengen's headaches and the associated limitations, especially as VanLengen's headaches improve with medication. Yet Dr. Kruusmagi's notes are replete with references to almost daily headaches (see above) and she repeatedly refilled VanLengen's prescriptions for prescription-strength Ibuprofen and for Sumatriptan, the two medications she prescribed to treat Plaintiff's headaches. *See* AR 808 (listing only these two medications as the medications Dr. Kruusmagi used to treat Plaintiff's headaches). Both Dr. Kruusmagi and VanLengen believed these medications were helpful but neither offered the opinion that they provided immediate or complete relief. *See* AR 808 (Dr. Kruusmagi's opinion that 800 mg. Ibuprofen and Sumatriptan offered "moderate relief"); 69 (VanLengen's testimony that headache medication "does help").

1    Other medical records also refer to VanLengen's long history of suffering from headaches,

2    and treatment records from doctors who treated VanLengen before Dr. Kruusmagi became

3    VanLengen's primary care physician show that VanLengen was treated for headaches for many

4    years. *See, e.g.,* AR 313 (treatment note for 2012 Santa Rosa Cardiology Medical Group referring

5    to "long history of headaches" and noting that a few months earlier her headache was so severe

6    she went to the Emergency Room); AR 787-792 (treatment records from multiple doctor visits in

7    2012 referring to "chronic daily headache" and prescribing propranolol).   Certainly, there is

8    nothing in the record that contradicts Dr. Kruusmagi's opinion that even *with* the medications she

9    prescribed, VanLengen has headaches approximately five times a week and that she typically

10   needs to rest two hours when they occur, as is stated in Dr. Kruusmagi's Headache RFC

11   questionnaire.

12    The ALJ's conclusory statement that the treatment record "demonstrated improvement in

13   foot pain, as well as abdominal pain" also is not a legitimate reason for rejecting Dr. Kruusmagi's

14   opinions about VanLengen's "need for lifting [no more than] 10 pounds, unscheduled breaks,

15   absences and preclusion from work activity."   For one thing, Dr. Kruusmagi did not reference

16   VanLengen's diagnosis of carpal tunnel in her feet in any of the assessments and there is no

17   indication that any of the limitation listed by Dr. Kruusmagi were based on foot pain.   Rather, with

18   the exception of the Headache RFC questionnaire, all of Dr. Kruusmagi's assessments listed *only*

19   Plaintiff's chronic abdominal pain as her diagnosis.   Indeed, VanLengen did not begin to

20   experience foot pain until the fall of 2015, when she began to see Dr. Hollander; she was referred

21   out for electrodiagnostic testing in September 2015, and was diagnosed with tarsal tunnel

22   syndrome at that point. AR 825828.   Yet Dr. Kruusmagi completed three out of four of the

23   assessments *before* VanLengen experienced foot pain or received this diagnosis and those

24   assessments included the limitations that the ALJ declined to credit.   As VanLengen's foot pain

25   clearly had nothing to do with these limitations, any improvement in VanLengen's foot pain has

26   no bearing on whether the medical record supports those limitations.

27    Nor is there any evidence in the medical records to support the ALJ's conclusory statement

28   that VanLengen's abdominal pain had improved such that the limitations Dr. Kruusmagi identified

should not be credited. This reason also is not "specific" as the ALJ did not point to any specific evidence in the medical record to support her statement that Plaintiff's abdominal pain had improved. In sum, ALJ Krolikowski improperly relied on the treatment records to conclude the Dr. Kruusmagi's opinions about Plaintiff's limitations should not be credited.[3]

### c. completion of one assessment "together"

In one treatment note, Dr. Kruusmagi wrote that VanLengen brought in "a form for her disability evaluation" and that "[w]e filled this out together." AR 1046. As the note was from a visit on February 24, 2016, it apparently refers to the last of the four assessments completed by Dr. Kruusmagi, namely, the Physical Assessment completed on that same date. Based on this note, ALJ Krolikowski concluded that Dr. Kruusmagi "thus apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." AR 38. There are two glaring problems with the ALJ's reasoning.

First, as discussed above, the limitations described in the Physical Assessment are consistent with the limitations listed in the assessments Dr. Krussmagi completed in previous years yet there is no evidence that Dr. Kruusmagi completed any of the earlier forms "together" with VanLengen. Under these circumstances, a reasonable interpretation of Dr. Kruusmagi's note is simply that she and VanLengen were "together" in the appointment when the form was completed; any possible inference that VanLengen simply dictated the limitations to Dr. Kruusmagi when she completed the form are negated by the fact that the same limitations are also included in the assessments that Dr. Kruusmagi had previously completed without VanLengen's participation.

The second problem is that ALJ's Krolikowski's reasoning relies on her conclusion elsewhere in the decision that VanLengen's own reporting of the severity of her symptoms was

---

[3] The Court also notes that ALJ Krolikowski ignored entirely the diagnosis of VanLengen's treating psychologist, Dr. Steinberg, that VanLengen suffered from "psychogenic pain," that is, that her chronic pain was at least partially the result of psychological factors. *See* AR 707, 714, 1009. As noted above, Dr. Steinberg agreed with Dr. Kruusmagi as to the severity of VanLengen's limitations.

not credible. "[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick*, 157 F.3d at 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112. "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Ligenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted).

The ALJ found that VanLengen's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 34. The ALJ did not find that VenLengen was malingering. Therefore, the ALJ was required to offer "specific, clear and convincing reasons" for rejecting VanLengen's testimony with respect to the severity of her symptoms. The ALJ did not meet that standard. Rather, the reasons she offered for her credibility findings are riddled with legal and factual errors. For example, ALJ Krolikowski minimized the limitations associated with VanLengen's low IQ and poor verbal comprehension on the basis that VanLengen "showed an ability to function in the community." AR 36, 38. Yet the evidence she cited in support of this conclusion stated just the opposite. In particular, the note upon which the ALJ relied stated that VanLengen presented with "apparent low IQ and ability to function in community." *See* AR 774. The previous sentence states that her boyfriend was "the only one" who visited her when she was in the hospital for a month and the sentence that follows states that VanLengen had "not worked for the most part." *Id.* Read in context, it is clear that in the sentence upon which the ALJ relied the word "low" was intended to modify both "IQ" and "ability to function in the community." This reading is also supported by the administrative record as a whole, which does not refer to *any*

examples of VanLengen engaging with "the community," much less an ability to "function in the community." Thus, ALJ Krolikowski's conclusion that VanLengen had shown an ability to function in the community is not supported by substantial evidence in the record.

ALJ Krolikowski also speculates that VanLengen's "current unemployment is [not] truly the result of medical problems" because VanLengen has "never worked." AR 34. This is factually incorrect. As discussed above, the administrative record reflects that VanLengen worked for several years. *See* AR 231, 241. Nor is there any mystery about why VanLengen stopped working for a number of years: she suffered from an alcohol and drug problem. *See* AR 1189 (statement of consultative examiner that Plaintiff had a "well-documented" "history of poly-drug use" including inhalant methamphetamine and marijuana up to 2013). Plaintiff reported, however, that she stopped using drugs and abusing alcohol in 2013, AR 86, and there is no evidence in the record to the contrary (nor did the ALJ make any such finding). Therefore, the Court concludes that the ALJ's reliance on VanLengen's having "never worked" is not an adequate reason for discounting VanLengen's credibility and is not supported by substantial evidence.

The ALJ also concludes Plaintiff was not credible as to the severity of her pain because of what she found were inconsistencies in her testimony as to the medications she was taking, concluding that pharmacy records from 2014-2016 "demonstrate the claimant was not taking her medications as she indicated." AR 34. She specifically called out what she found to be inconsistent testimony about VanLengen's use of gabapentin, stating that the medical record did not support VanLengen's testimony that she took six gabapentin pills daily. *Id*. Yet the transcript of the hearing reflects that VanLengen's testimony regarding her medications (and the ALJ's own questions) verged on incoherent. It is apparent that VanLengen was extremely confused and she often expressed uncertainty in response to the ALJ's questions. *See* AR 73-77 ("I honestly don't remember"; "I really can't remember"; "I'm taking so many medications right now I don't even know the names of them"; "I can't remember the name of it"; "I'm take – I don't know the name of it"; "I don't know the name of it"). With respect to the testimony about VanLengen's use of gabapentin, this confusion is particularly apparent. AR 76 (Q: Are you taking gabapentin? A: What – is for my – Q: That's for you – A: -- kidneys? Q: – feet."). In light of VanLengen's

22

confused testimony – which is entirely consistent with her diagnosed cognitive impairment – ALJ

Krolikowski's reliance on those inconsistencies to discredit VanLengen's testimony is misplaced.

Even more disturbing is ALJ Krolikowki's reliance on pharmacy records showing that

VanLengen filled her hydrocodone prescription only in February 2014, May 2014 and March

2016 as a basis for concluding that the pain VanLengen experienced was not as severe as she

claimed. *See* AR 34. As discussed above, the record reflects that Dr. Kruusmagi prescribed

hydrocodone only occasionally, usually in connection with recent surgical procedures, and

cautioned VanLengen that the prescriptions should "last." ALJ Krolikowski's suggestion that

VanLengen's testimony is not credible because she *heeded* her doctor's advice as to how this

prescription medication should be used is improper. ALJ Krolikowski is not trained as a doctor

and may not substitute the doctor's opinion with her own. *See Day v. Weinberger*, 522 F.2d 1154,

1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond

that demonstrated by the record); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (an

"ALJ cannot arbitrarily substitute his own judgment for competent medical opinion") (internal

quotation marks and citation omitted); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs

must not succumb to the temptation to play doctor and make their own independent medical

findings").

Finally, the ALJ does not offer "specific, clear and convincing reasons" for discounting

VanLengen's pain testimony based on VanLengen's activities of daily living. *See* AR 35. The

Ninth Circuit has held that "daily activities may be grounds for an adverse credibility finding 'if a

claimant is able to spend a substantial part of his day engaged in pursuits involving the

performance of physical functions that are transferable to a work setting.'" *Orn v. Astrue*, 495 F.3d

625, 639 (9th Cir. 2007) (quoting *Fair v*. Bowen, 885 F.2d 597, 603). Here, the ALJ states:

> The claimant admitted activities of daily living including dishes,
> grocery shopping, making the bed, folding clothes, performing
> personal care tasks, helping care for the cat as well as helping to care
> for her uncle. Some of the physical and mental abilities and social
> interactions required in order to perform these activities are the same
> as those necessary for obtaining and maintaining employment.

*Id*. While the ALJ apparently found that these activities were transferrable to the workplace, she

made no finding that VanLengen was able to spend a substantial part of her day engaged in them. Nor does the evidence in the record support such a conclusion. To the contrary, VanLengen consistently testified that her ability to engage in the activities listed by the ALJ was very limited. *See* AR 87-91. Therefore, the Court concludes that the ALJ's reliance on VanLengen's daily activities was not sufficient to meet the clear and convincing reasons standard that applies to credibility determinations.

In sum, the ALJ offered inadequate reasons for rejecting Van Lengen's testimony about the limiting effects of her pain. The ALJ amplified this error to the extent that she relied upon Van Lengen's lack of credibility to conclude that the opinions of Dr. Kruusmagi also were entitled to little weight because Dr. Kruusmagi "uncritically accept[ed] as true most, if not all, of what the claimant reported." AR 38. Except as to VanLengen's limitations in the use of her hands and arms, the ALJ erred in rejecting Dr. Kruusmagi's opinions about VanLengen's limitations; the ALJ's reasons for giving Dr. Kruusmagi's opinions little weight are not specific and legitimate and are not supported by substantial evidence in the record.

### D. Remedy

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1177–78 (9th Cir. 2000). Under this Circuit's "credit as true" rule, a court must credit as true evidence that was rejected and remand for an immediate award of benefits if "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* at 1178 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). On the other hand, a court should remand for further proceedings when "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison*, 759 F.3d at 1021, or where "there is a need to resolve conflicts and ambiguities," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

The Court has found that the ALJ failed to provide legally sufficient reasons for rejecting

24

the opinions of VanLengen's treating physician, Dr. Kruusmagi, with respect to VanLengen's symptoms and limitations. The Court further finds that under the credit-as-true rule, the testimony of Dr. Kruusmagi establishes that VanLengen was disabled. In particular, Dr. Kruusmagi's opinions that VanLengen would need to take frequent breaks due to her pain and would miss more than four days a month of work establishes that she could not perform any of the jobs listed by the ALJ at step five. *See* AR 105 (VE testimony that none of the listed jobs would be available to a hypothetical individual who was off task more than 10% of the time or missed more than two days a month of work).

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment and remands to the Social Security Administration for award of benefits.

**IT IS SO ORDERED.**

Dated: July 3, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge